IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMARA BERG | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 13-5980 |
| ACCESS GROUP, INC., ET AL. | : | |

**SURRICK, J.**                                                    **SEPTEMBER 26 , 2014**

<u>**MEMORANDUM**</u>

Presently before the Court are Defendants Access Group, Inc., and PNC Financial

Services Group, Inc.'s Motion to Dismiss Plaintiff's Complaint (ECF No. 22), Defendant

Kentucky Higher Education Student Loan Corporation's Motion to Dismiss Plaintiff's

Complaint (ECF No. 21), and Plaintiff Tamara Berg's Motion to Dismiss Access Group, Inc.'s

Counterclaims (ECF No. 28).  For the following reasons, Defendants' Motions will be granted,

and Plaintiff's Motion will be denied.

**I.     BACKGROUND**

**A.     Factual History[1]**

Plaintiff, a citizen of California, is an individual who financed part of her post-graduate

education through student loans.  (Compl. ¶ 1; ECF No. 1.)  Plaintiff specifically applied for this

financial aid through lending programs sponsored by Defendant Access Group, Inc. ("Access

Group"), a non-profit corporation incorporated in Delaware with its principal place of business in

Pennsylvania.  (*Id.* at ¶¶ 6, 9.)  Through Access Group, Plaintiff obtained three loans from

---

[1] In considering Defendants' Motions to Dismiss under the Federal Rule of Civil
Procedure 12(b)(6), "we accept all factual allegations as true [and] construe the complaint in the
light most favorable to the plaintiff."  *DelRio-Mocci v. Connolly Props., Inc.*, 672 F.3d 241, 245
(3d Cir. 2012) (quoting *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 83 (3d Cir. 2011)
(alteration in original)).  We rely on the operative facts as presented in Plaintiff's Complaint.

National City Bank:  (1) a loan for $800 on April 2, 2000 ("Loan One"); (2) a loan for $28,026 on August 23, 2000 ("Loan Two"); and (3) a loan for $30,216 on July 23, 2001 ("Loan Three"). (*Id.* at ¶¶ 11-13.)[2]  For each loan, Plaintiff and National City Bank entered into a loan contract. (Loan One Contract, Compl. Ex. 1; Loan Two Contract, Compl. Ex. 2; Loan Three Contract, Compl. Ex. 3 (collectively "Loan Contracts").)  Access Group was not a party to the Loan Contracts.  Access Group also claims Plaintiff entered into a fourth loan contract for $24,000 on July 16, 1999, which Plaintiff denies.  (Compl. at ¶ 14.)

Loan One Contract contains the following language:

1.      Guarantee Fee – I will pay a guarantee fee to [National City Bank], which [National City Bank] will forward to The Education Resources Institute, Inc. (hereinafter referred to as "TERI"), to pay for its guarantee of this Promissory Note.  I will pay a guarantee fee equal to 6% of the amount of each disbursement.

2.      Deducted from Disbursements – At the time [National City Bank] issue[s] any disbursement, [National City Bank] will deduct that guarantee fee from the disbursement.   If [National City Bank] do[es] not withhold a fee from the proceeds of the loan and I have not already paid that fee, I agree to pay it when [National City Bank] bill[s] me for it.  I will not be entitled to any refund of any guarantee.

3.      Supplemental Guarantee Fee – I will pay a supplemental guarantee fee determined by [National City Bank], not to exceed 6.9% of the principal amount advanced to me or paid on my behalf. . . . The supplemental guarantee fee will be sent to TERI . . . .

4.      I acknowledge that the guarantee fee and the supplemental guarantee fee are fair and reasonable charges for the guarantee of my loan, and represent [National City Bank's] actual expenses incurred in obtaining such guarantee, and that [National City Bank] would not make the loan without such guarantee.

(Loan One Sec. G.)

---

[2] National City Bank was acquired by Defendant PNC Financial Services Group, Inc. ("PNC").  (Compl. ¶ 7; Access's Mot. 1 n.2, ECF No. 22.)  As a result, PNC is the successor entity to National City Bank.  PNC has its principal place of business in Pennsylvania.  (Compl. ¶ 7.)

The Loan Two and Loan Three Contracts contain the following similar but slightly different language:

> 1.      I will pay a guarantee fee not to exceed 12.9% of the outstanding principal balance, including accrued interest that has been added to the principal balance . . . The guarantee fee will be payable on the last day of the Interim Period, after any accrued interest has been added to the principal balance.  The guarantee fee will be sent to a party who will guarantee my loan.  I agree that you can add the amount of the guarantee fee to the outstanding balance of my loan.  I will not be entitled to any refund of the guarantee fee.

> 2.      I acknowledge that the guarantee fee is a fair and reasonable charge for the guarantee of my loan, and represents your actual expenses incurred in obtaining such guarantee, and that you would not make the loan without such guarantee.

(Loan Two Sec. G; Loan Three Sec. G.)  Plaintiff has been charged guarantee fees and supplemental guarantee fees of at least $10,533.70, plus capitalized interest.  (Compl. ¶ 22.)  Once Plaintiff's loans became payable, she received periodic statements from Access Group directing her to send monthly payments to its loan servicer, Kentucky Higher Education Student Loan Corporation ("KHESLC").  (*Id.* at ¶ 4.)  KHESLC is an independent de jure municipal corporation and political subdivision of the Commonwealth of Kentucky that provides education loans for students and parents.  (*Id.* at ¶ 8.)

From February 21, 2003, to around April 4, 2007, Plaintiff paid $25,064.72 to KHESLC.  (*Id.* at ¶¶ 6, 22.)  On September 11, 2012, Access Group filed suit against Plaintiff in the Superior Court of the State of California, San Diego County to recover the remainder that Plaintiff owed on the Loan Contracts ("California Litigation").  (*Id.* at ¶ 6; *Access Group Inc. v. Berg*, No. 37-2012-103426 (Cal. Sup. Ct. San Diego, filed Sept. 11, 2012).)  In the California Litigation, Plaintiff sought proof that Access Group was the real party in interest to the Loan Contracts.  (Compl. ¶ 7.)  Plaintiff claims Access Group was unable to make that showing and thus the California Court ultimately dismissed Access Group's claims on June 14, 2013.  (*Id.* at

¶¶ 7, 27.)  Access Group was granted leave to amend its complaint but voluntarily dismissed its case against Plaintiff on August 22, 2013.  (*Id.* at ¶ 27.)

Plaintiff also claims that during the course of the California Litigation, Access Group attested that the guarantee fees and supplemental guarantee fees were never sent to TERI or any other party that guaranteed the Loan Contracts.  (*Id.* at ¶ 23.)   Plaintiff specifically states that in a response to discovery in the California Litigation dated February 20, 2013, Access Group's Christopher Mulvihill, Director Loan Recovery and Collections, stated "[t]here is no guarantee by anyone or any entity related to these [Loan Contracts]."  (*Id.* at ¶ 24.)  In addition, Keith Coughey, Access Group's Vice Present of Risk Management & Financial Analysis, responded to a discovery request on May 20, 2013, asserting that guarantee fees and supplemental guarantee fees charged to Plaintiff were not for a guarantee of the loans by a third party, but were "a pricing mechanism that promotes economic viability."  (*Id.* at ¶ 25.)  Coughey allegedly stated that Plaintiff's loans, and loans made under the same program to other individuals, "will not benefit from a third-party or any other type of repayment guarantee."  (*Id.*)

### B.    Procedural History

Plaintiff initiated this action by filing the Complaint on October 11, 2013.  (Compl.)  Plaintiff brings five claims as an individual and as a class representative, on behalf of those similarly situated.  In this capacity, Plaintiff specifically brings suit against all Defendants for intentional misrepresentations, claiming that Defendants misrepresented the amount of actual costs incurred to obtain guarantees for the Loan Contracts (Count II).  Plaintiff seeks restitution from all Defendants for any overpayments made under the Loan Contracts (Count III).  In addition, she brings a claim against Access Group and PNC for breach of the Loan Contracts (Count I).   Plaintiff also brings a claim against Access Group and KHESLC for intentional

4

misrepresentation, claiming those parties misrepresented what entity owned the Loan Contracts (Count IV) and for restitution for payments made to entities that did not own the Loan Contracts (Count V).  Finally, Plaintiff brings an additional claim for restitution only in her individual capacity against all Defendants for all payments she made on the July 16, 1999 loan, which she claims that she never executed (Count VI).  On January 21, 2012, Access Group and PNC filed a Motion to Dismiss Plaintiff's Complaint.  (Access's Mot.)  That same day, KHESLC joined Access Group and PNC's Motion and filed its own Motion to Dismiss.  (KHESLC's Mot., ECF No. 21.)  KHESLC specifically claims that Plaintiff's claims against it must be dismissed because KHESLC is entitled to sovereign immunity.  On March 7, 2014, Plaintiff filed a Response in opposition to Defendants' Motions.  (Pl.'s Opp'n, ECF No. 27.)  On April 14, 2014, Access Group and PNC filed a Joint Reply in support of their Motion (Access's Reply, ECF No. 38) and KHESLC also filed a Reply in support of its Motion (KHESLC's Reply, ECF No. 39).

Also on January 21, 2012, Access Group answered Plaintiff's Complaint and brought Counterclaims against Plaintiff.  (Countercl., ECF No. 23.)  Access Group brings a breach of contract claim against Plaintiff (Count I) alleging that Plaintiff failed to repay her student loans in accordance with the Loan Contracts that she entered into with National City Bank.  In the alternative, Access Group brings a claim for unjust enrichment (Count II) alleging that Plaintiff has unjustly retained the benefits from the July 16, 1999 Loan without paying for them.  On March 3, 2014, Plaintiff filed a Motion to Dismiss Access Group's Counterclaims.  (Pl.'s Mot., ECF No. 28.)  Access Group filed a Response in opposition on April 11, 2014.  (Access's Opp'n, ECF No. 36.)  On April 23, 2014, Plaintiff filed a Reply in support of her Motion.  (Pl.'s Reply, ECF No. 42.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), "a pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief." Failure to state a claim upon which relief can be granted is basis for dismissal of the complaint. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *McTernan v. City of York*, 564 F.3d 636, 646 (3d Cir. 2009).

In determining whether dismissal is appropriate, courts use a two-part analysis. *Fowler*, 578 F.3d at 210. First, courts separate the factual and legal elements of the claim and accept all of the complaint's well-pleaded facts as true. *Id.* at 210-11. Next, courts determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 211. Given the nature of the two-part analysis, "'[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *See McTernan*, 577 F.3d at 530 (quoting *Iqbal*, 556 U.S. 663-64).

In addition to the Rule 8(a)(2) general pleading standard, the Federal Rules of Civil Procedure also require a heightened pleading standard for specific actions. Fed. R. Civ. P. 9(b). In particular, when a litigant alleges fraud, he or she must do so "with particularity." *Id.* Rule 9(b) commands that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* Pursuant to this heightened pleading standard, plaintiffs must "plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). This requires a description of the "who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotation marks and citation omitted). Rule 9(b) is generally considered satisfied when a defendant has "fair notice" of the charges against it. *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1126 (E.D. Pa. 1991).

## III.   DISCUSSION OF PLAINTIFF'S CLAIMS

### A.   Plaintiff's Breach of Contract Claim

To state a claim for breach of contract, a plaintiff must allege:  (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994).[3]  Access Group claims

---

[3] The parties agree that the choice of law provision in the Loan Contracts provide that Ohio law governs the breach of contract claim. (Access's Mot. 7; Pl.'s Opp'n 12.)  "In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state . . . ."  *Nuzzi v. Aupaircare, Inc.*, 341 F. App'x 850, 852 (3d Cir. 2009) (citations omitted).  Pennsylvania law provides that when parties have contracted for a specific body of law, the "[c]hoice of law provisions in [the] contracts will generally be given effect."  *Smith v. Commonwealth Nat'l Bank*, 557 A.2d 775,

that Plaintiff cannot sufficiently allege a claim for breach of contract because she has not alleged that she performed under the Loan Contracts.  We agree.  "An essential element of a claim for breach of contract under Ohio law is performance by the plaintiff."  *HSBC Bank USA, Nat'l Trust Co. v Teagarden*, 6 N.E.3d 678, 687 (Ohio Ct. App. 2013) (internal quotation marks omitted).  Under the Loan Contracts, Plaintiff agreed to repay the amounts that she borrowed, plus interest and fees, in "consecutive monthly" installments.  (Loan Contracts E.2.)  Plaintiff admits that she stopped making monthly payments to satisfy the Loan Contracts on April 4, 2007.  (Compl. ¶ 22.)  Plaintiff cannot plead that she performed under the Loan Contracts.  Therefore, she cannot sustain a claim for breach of contract.

This conclusion is supported by recent Ohio caselaw.  Specifically, a number of Ohio courts have refused to allow plaintiffs who stopped making their monthly mortgage payments to bring breach of contract claims against the mortgage lender, finding that the plaintiffs failed to plead that they performed under the contract.  *Ogle v. BAC Home Loan Servicing LP*, 924 F. Supp. 2d 902, 915 (S.D. Ohio 2013) (finding the plaintiff "failed to plead performance" where the plaintiffs admittedly stopped making mortgage payments); *Wells Fargo Bank, N.A. v. Favino*, No. 10-571, 2011 U.S. Dist. LEXIS 35618, at *28 (S.D. Ohio Mar. 31, 2011) (finding the plaintiff failed to allege facts to prove his performance when he did not allege he made the required monthly payments up until when the action was filed); *Teagarden*, 6 N.E.3d at 687 (finding the plaintiffs could not claim to have performed under the mortgage if they were in default).  The reasoning in these cases applies to the current situation:  Plaintiff failed to make

---

777 (Pa. Super. Ct. 1989); *see Kruzitz* v. *Okuma Machine Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994).  We will therefore construe the terms of the Loan Contracts, and the parties' respective obligations thereunder, according to Ohio Law.

her required monthly loan payments just as the plaintiffs in the Ohio cases failed to make their required monthly mortgage payments.

Plaintiff's argument that the Ohio cases are different because the Loan Contracts are divisible fails.  Plaintiff accurately notes that "Ohio courts have endorsed the principle of divisible contracts."  *Lutz v. Chesapeake Appalachia, L.C.C.*, 717 F.3d 459, 466 (6th Cir. 2013). In fact, "[t]he general rule regarding loans repayable in installments is that each default in payment may give rise to a separate cause of action."  *Citizens Bank of Logan v. Marzano*, No. 04CA4, 2005 WL 103165, at *4 (Ohio Ct. App. Jan. 5, 2005).  Therefore, breach of an installment payment is not a breach of the entire contract.  *Id.*; *O'Brien v. Ravenswood Apartments, Ltd.*, 862 N.E.2d 549, 558 (Ohio Ct. App. 2006).  Plaintiff claims that this principle applies to the Loan Contracts, and that she can sustain a breach of contract claim on the divisible installment contracts from February 27, 2003, through April 4, 2007, because she performed under those installments by making the monthly payments that were due.  Plaintiff's argument overlooks a critical aspect of Ohio contract law.  That critical aspect is the effect of an acceleration clause on an installment contract.  By including an acceleration clause, the breach of an installment contract can constitute a breach of the entire contract.  *O'Brien*, 862 N.E.2d at 558; *Marzano*, 2005 WL 103165, at *4.  Here, the Loan Contracts included an acceleration clause that stated if Plaintiff "fail[ed] to make any monthly payment . . . when due" then National City Bank has "the right to give [Plaintiff] notice that the whole outstanding principal balance, accrued interest, and all other amounts payable" under the Loan Contracts becomes due immediately.  (Loan Contracts J.)  Therefore, when Plaintiff failed to make a timely monthly

payment she failed to perform under the entire Loan Contracts, not just one divisible installment. Plaintiff's breach of contract claim will be dismissed.[4]

### B.    Plaintiff's Intentional Misrepresentation Claims

Stating a claim for intentional misrepresentation requires showing:  (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately cause by the reliance.  *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999).[5]  All of these elements must be pled with particularity that satisfies the Rule 9(b) heightened pleading standard.  *Hanover Ins. Co. v. Ryan*, 619 F. Supp. 2d 127, 141 (E.D. Pa. 2007) (applying Rule 9(b) to an intentional misrepresentation claim).  Access Group claims Plaintiff cannot support either of her two misrepresentation claims.  Plaintiff disagrees.

### 1.    Count II

Access Group argues that Plaintiff's first intentional misrepresentation claim fails because she has not sufficiently pled that any misrepresentation made was material.  As listed above, materiality is an element of a claim for intentional misrepresentation.  Nevertheless,

---

[4] Since Plaintiff's claim for breach of contract will be dismissed based on Plaintiff's failure to plead that she performed under the contract, we need not determine whether the language of the contract would have supported her claim.

[5] "Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage.'"  *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006).  Accordingly, the choice of law provision in the Loan Contracts does not apply to the common-law claims alleged in the Complaint and Access Group's Counterclaim.  For the claims of intentional misrepresentation, the parties do not perceive a conflict between Pennsylvania, Kentucky, and Ohio as to the elements required to prove the tort.  (Access's Mot. 11; Pl.'s Opp'n 17 n.6.)  Since there is no dispute between the parties regarding the choice of law, we will not engage in a choice-of-law analysis with respect to this issue and will assume that these laws are not in conflict.  *See USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999) (assuming without deciding that Pennsylvania law governed diversity suit where parties agreed on choice of law).

Plaintiff attempts to argue that materiality is actually not an element of intentional misrepresentation.  Plaintiff's argument relies on a statement in the case of *Silverman v. Bell Savings & Loan Ass'n*, 533 A.2d 110 (Pa. Super. Ct. 1987), and a narrow reading of a statement in the *Bortz* case.  We reject Plaintiff's argument.  The Pennsylvania Supreme Court clearly listed "material to the transaction at hand" as an element of intentional misrepresentation in 1994 and again in 1999.  *See Bortz*, 729 A.2d at 560; *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994). Clearly the more recent statement from the Supreme Court of Pennsylvania controls over an older statement by the Pennsylvania Superior Court.  Furthermore, Plaintiff cites no recent case—and our independent research revealed none—in which materiality is absent as an element of intentional misrepresentation.  To the contrary, recent Pennsylvania state cases and recent federal cases applying Pennsylvania law specifically apply materiality as a required element.  *See Yurchak v. Atkinson & Mullen Travel, Inc.*, 207 F. App'x 181, 184 (3d Cir. 2006) (rejecting claim for intentional misrepresentation because misrepresentation was not material); *Caplen v. Burcik*, No. 3144-2000, 2000 WL 33711068, at *16 (Pa. Ct. C.P. Aug. 4, 2000) (same); *see also Mancini v. Yovorek*, 61 Pa. D. & C.4th 1, 5 (Pa. Ct. C.P. 2003).  Therefore, Plaintiff must plead that the misrepresentation made by Defendants was material to successfully state a claim.  Under Pennsylvania law, "[a] misrepresentation is 'material' when it is of such a character that if it had not been made, the transaction would not have been entered into."  *Lind v. Jones, Lang Lasalle Ams., Inc.*, 135 F. Supp. 2d 616, 620 (E.D. Pa. 2001) (citing *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1252 (Pa. Super. Ct. 1983)).[6]

---

[6] Plaintiff claims that if we find that materiality is an element of intentional misrepresentation we must engage in a conflicts-of-law analysis because Pennsylvania and Ohio define materiality differently.  Plaintiff notes that a number of Ohio courts state, "a misrepresentation of fact is material when, under the circumstances, it would likely affect the conduct of a reasonable person in determining whether to enter into the transaction at issue."

In Count II, Plaintiff brings a claim for intentional misrepresentation against all Defendants alleging that in the Loan Contracts, they misrepresented the amount of actual costs that the lender incurred to guarantee the loans under the Loan Contracts.  Assuming that Defendants did make such a false representation, Plaintiff's claim fails because the Complaint does not allege that the representation was material to the transaction.[7]  Plaintiff alleges no facts in the Complaint that would establish that she would not have entered into the Loan Contracts if the alleged misrepresentation had not been made.  At most, she makes an unqualified statement that "Defendants represented that an important fact was true, when that fact was false."  (Compl. ¶ 49.)  Even if we were to accept the conclusory statement that the representation was important, there is still no fact alleged that could establish that Plaintiff's decision to execute the Loan Contracts turned on this particular "important" fact.  Indeed, nothing in the Complaint indicates that the misrepresentation affected her conduct at all.[8]

---

*Saxe v. Dlusky*, No. 09AP-673, 2010 WL 4324198, at *10 (Ohio Ct. App. Nov. 2, 2010). Plaintiff claims that this creates an actual conflict between the law of Ohio and the law of Pennsylvania.  However, Plaintiff fails to note that a number of Ohio courts also use the same definition of materiality as Pennsylvania.  *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 741 (S.D. Ohio 2009) (citing *Burke Lakefront Serv. v. Lemieux*, No. 79665, 2002 WL 1821962 (Ohio Ct. App. Aug. 8, 2002)) ("A representation is material if it is essential to contract formation; in other words, if the contract would not be formed but for the representation, then the representation is material.").  Therefore, there may be no actual conflict.  Even assuming that an actual conflict does exist, it is of no significance here because Plaintiff's claims would fail under both definitions of material.  We need not engage in a choice-of-law analysis where the outcome is the same regardless.

[7] Plaintiff argues that the transaction at issue is the actual payment of the guarantee fees, not the execution of the Loan Contracts.  This argument is misguided.  The transaction at issue is clearly the execution of the Loan Contracts because that is when the alleged misrepresentation was made to her.  In addition, it was upon execution of the Loan Contracts that Plaintiff agreed to and became responsible for paying the guarantee fees.

[8] In her Response, Plaintiff claims that if not for the misrepresentation, Plaintiff would have obtained financing from another source.  (Pl.'s Opp'n. 26.)  These assertions are nowhere in the Complaint.  Therefore, they cannot be relied upon to survive a motion to dismiss.

We reject Plaintiff's argument that the representation was material because the Loan Contract stated that the lender "would not make the loan without [a] guarantee." That term indicates that the guarantee was material to the lender. It tells us nothing about the significance that Plaintiff placed on the representation that the guarantee fees charged were equal to the cost incurred by the lender to guarantee the loans. The Complaint is simply devoid of any facts that could establish that the alleged misrepresentation was material here. Accordingly, Plaintiff's claim will be dismissed.

2. *Count IV*

In Count IV, Plaintiff brings a claim for intentional misrepresentation against Access Group and KHESLC, claiming that they misrepresented to Plaintiff that Access Group owned the Loan Contracts. In the Complaint, Plaintiff claims that shortly after Plaintiff's loans became payable, she began receiving periodic statements that indicated monthly installments were due to Access Group on the Loans. (Compl. ¶¶ 4, 21.) Plaintiff alleges the statements came from KHESLC, who represented that it was the servicer of the Loan Contracts, as authorized by Access Group. (*Id.* at ¶ 21.) The Complaint contains no other details surrounding these alleged misrepresentations. We find that Plaintiff has failed to sufficiently meet the Rule 9(b) heightened pleading standard that requires a description of the "who, what, when, where, and how." *In re Rockefeller Ctr. Props., Inc. Secs. Litig.,* 311 F.3d at 217. The scant facts provided by Plaintiff do not specify any misrepresentations made by either KHESLC or Access Group. Rather, Plaintiff makes general assertions about periodic statements that she received from KHESLC, without pointing to any specific representation. It is impossible to analyze whether a representation was false or stated with the intent needed to support an intentional misrepresentation claim when no representation is identified. In addition, Plaintiff does not

13

provide dates when the alleged misrepresentations occurred.  Without such specificity, Plaintiff

has not stated a claim for intentional misrepresentation.  *See Yakubov v. GEICO Gen. Ins. Co.*,

No. 11-3082, 2011 WL 5075080, at *3 (E.D. Pa. Oct. 24, 2011) (dismissing intentional

misrepresentation claim where the plaintiff did not "allege with specificity who made the

statements, when or where the statements were made, what the statements were, or even how the

statements were communicated"); *Hewlett-Packard Co. v. Arch Assoc. Corp.*, 908 F. Supp. 265,

274 (E.D. Pa. 1995) (dismissing intentional misrepresentation claim where misrepresentations

were identified only in general terms).  Count IV will be dismissed.

### C.      Plaintiff's Restitution Claims

In the event that Plaintiff is unable to recover for breach of contract, she alternatively

seeks to recover against Defendants in Count III on the theory of restitution.  Plaintiff seeks

restitution for the amount Defendants received that was more "than was required under the terms

of the loan contracts."  (Compl. ¶ 58.)  "Claims for unjust enrichment and the corresponding

remedy, restitution, are only supportable when the parties' rights are not governed by a valid,

enforceable contract."  *Estate of Gleiberman v. Hartford Life Ins. Co.*, 94 F. App'x 944, 947 (3d

Cir. 2004) (citation omitted).[9]  The Loan Contracts govern the amount Plaintiff owed to National

City Bank or its successors in interest.  Plaintiff does not claim the Loan Contracts are invalid or

unenforceable.  Therefore, a restitution claim is improper.  To the extent Plaintiff would like to

challenge the amount she owes under the Loan Contracts, her remedy lies in a breach of contract

action.

---

[9] The parties agree that there is no conflict between the laws of Pennsylvania, Ohio, or
Kentucky with respect to restitution.  (Defs.' Mot. 17 n.20; Pl.'s Opp'n 23 n.9.)  Thus, we will
apply the law of the forum state, Pennsylvania.

Plaintiff brings an additional claim for restitution in Count V against Access Group and KHESLC. Plaintiff seeks restitution "[t]o the extent that National City Bank did not properly assign its rights to the Loan Contracts" and Access Group or KHESLC benefited from Plaintiff's payments under the Loan Contracts. (Compl. ¶¶ 71-72.) This claim again is actually based on the Loan Contracts. Plaintiff admits she was making payments pursuant to the Loan Contracts. To the extent she claims she was harmed because National City Bank did not properly assign the Loan Contracts to other entities and she paid incorrect entities, her remedy lies in an action against National City Bank. Claims for unjust enrichment cannot be asserted when "the contract forms the basis for . . . [the] claims." *Kushnir v. Aviva Life & Annuity Co.*, No. 11-7701, 2013 WL 4479196, at *4 (E.D. Pa. Aug. 22, 2013).

In any event, Plaintiff has not pled a critical element under unjust enrichment: that Access Group and KHESLC retained benefits under inequitable circumstances.[10] Plaintiff admits she owed money under the Loan Contracts and that the payments were made in accordance with the Loan Contracts. She does not claim that the payments were not credited towards what she owed under the Loan Contracts. Even if the Loan Contracts were improperly assigned, "this is not a circumstance in which the defendant's retention of a benefit conferred by the plaintiff without compensation disturbs the plaintiff's expectation of payment, resulting in an injustice that should be remedied by this Court." *CPC Props., Inc. v. Dominic, Inc.*, No. 12-4405, 2013 WL 4457338, at *6 (E.D. Pa. Aug. 21, 2013). Plaintiff made payments toward the

---

[10] Restitution or unjust enrichment is an equitable doctrine with the following elements: "(1) the plaintiff conferred benefits upon the defendant; (2) the defendant realized those benefits; and (3) the defendant accepted and retained the benefits under circumstances in which it would be inequitable for it to retain them without payment of value." *Bunnion v. Consol. Rail Corp.*, 108 F. Supp. 2d 403, 427 (E.D. Pa. 1999).

balance she admittedly owed under the Loan Contracts.  She cannot reasonably claim that she

expected to get that money back.  Plaintiff's claims for unjust enrichment will be dismissed.

### D. KHESLC's Immunity

KHESLC filed an independent motion to dismiss claiming that it is immune from suit

based on (1) the Eleventh Amendment to the United State Constitution and (2) Kentucky state

law.

### 1. *Eleventh Amendment Sovereign Immunity*

KHESLC argues that, as an arm of the Commonwealth of Kentucky, it is immune from

all of Plaintiff's claims.  The Third Circuit uses a three-prong test to determine whether an

agency is an arm of a state.  The test looks at:  (1) whether the money that would pay the

judgment would come from the state; (2) the status of the agency under state law; and (3) the

degree of autonomy of the agency.  *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655,

659 (3d Cir. 1989).  "We . . . accord equal consideration to all three prongs of the analysis."

*Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006); *see also Bowers v. Nat'l Coll.*

*Athletic Ass'n*, 475 F.3d 524, 549 (3d Cir. 2007) ("Under current precedent . . . we are required

to consider each of the factors equally when determining whether an entity is entitled to Eleventh

Amendment immunity.").  However, "in close cases, where 'indicators of immunity point in

different directions,' the principal rationale behind the Eleventh Amendment—protection of the

sovereignty of states through 'the prevention of federal-court judgments that must be paid out of

a State's treasury,' should 'remain our prime guide.'"  *Febres*, 445 F.3d at 229-30 (quoting *Hess*

*v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47-48 (1994)).  The party asserting immunity

bears the burden of production and persuasion.  *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140,

1144 (3d Cir. 1995).

(i)      Payment from the State

This factor requires a determination of whether the Commonwealth of Kentucky is legally liable to pay any judgment against KHESLC.  *Bowers*, 475 F.3d at 546-47.  In making this assessment, we examine:  (1) whether payment will come from the state's treasury; (2) whether the agency has the money to satisfy the judgment; and (3) whether the sovereign has immunized itself from responsibility for the agency's debts.  *Fitchik*, 873 F.2d at 659.  "What is significant is whether the money that pays the fine will come from the state treasury rather than the agency's funds, or (alternatively) whether the state must reimburse the agency and thus effectively pay the debt."  *Id.* at 600; *Bowers*, 475 F.3d at 546-47.

KHESLC contends that any judgment against it would be satisfied, at least in part, by Kentucky funds.  In support of its argument, KHESLC points to a number of Kentucky statues that collectively indicate that KHESLC has the ability to request state funds and Kentucky has the ability to appropriate state funds for KHESLC's use.  *See* Ky. Rev. Stat. §§ 164.070(2); 164A.190; 164A.160.  This is not sufficient to tip this factor in favor of KHESLC.  Even though Kentucky is able to use state funds to support KHESLC, such support is not mandated, and "a state's voluntary contributions to an entity do not create an Eleventh Amendment jurisdictional bar:  'Although the [state] might well *choose* to appropriate money to [an entity] to enable it to meet a shortfall caused by an adverse judgment, such voluntary payments by a state simply do not trigger Eleventh Amendment immunity.'" *Febres*, 445 F.3d at 234 (quoting *Christy*, 54 F.3d at 1147 (emphasis and alterations in original)).  In addition, simply receiving funds from the state does not make an agency immune.  *See id.* (finding first factor weighed against immunity where agency received a large percentage of its funds from the state).  The facts here indicate that the first factor weighs against finding immunity for KHESLC.

17

(ii)     Status under State Law

In assessing KHESLC's status under state law, four sub-factors are relevant:  (1) how state law treated KHESLC generally; (2) whether KHESLC is separately incorporated; (3) whether KHESLC can sue or be sued in its own right; and (4) whether KHESLC is immune from state taxation.  *Febres*, 445 F.3d at 230; *Carter v. City of Phila.*, 181 F.3d 339, 347 n.22 (3d Cir. 1999).  These factors are mixed with regard to KHESLC.  KHESLC is separately incorporated and can be sued in its own right.  These factors do not support immunity.  However, KHESLC's exemption from taxation leans towards immunity.  Ky. Rev. Stat. § 164A.200.  So too, Kentucky's general treatment of KHESLC leans more towards immunity.  When creating KHESLC, the intent of the legislature was to "provid[e] higher education assistance to needy, qualified students" because "the attainment by every citizen of his or her educational goals will inure to the general welfare, well-being, and productivity of the Commonwealth."  Ky. Rev. Stat. Ann. § 164A.010.  Although courts have not specifically ruled that KHESLC is a "state agency," entities similar to KHESLC that were likewise created by the legislature to benefit the people of the state in obtaining higher education have been treated as state agencies.  *See U.S. ex rel. Oberg v. Pa. Higher Edu. Assistance Agency*, 745 F.3d 131, 140, 142, 145 (4th Cir. 2014); *Pele v. Pa. Higher Edu. Assistance Agency*, -- F. Supp. 2d --, No. 13-1531, 2014 WL 1329409, at *8 (E.D. Va. Apr. 2, 2014); *In re Kahl*, 240 B.R. 524, 533-34 (Bankr. E.D. Pa. 1999).  Overall, KHESLC's status under state law is relatively neutral.  It does not weigh heavily in either direction.

(iii)     Degree of Autonomy

"The final *Fitchik* factor focuses on the degree of independence from state control an entity exercises."  *Bowers*, 475 F.3d at 548.  KHESLC lists a number of reasons why it is not an

autonomous entity.  First, the Governor of Kentucky appoints ten of the fifteen KHESLC board members.  This fact does weigh "slightly" in favor of immunity.  *Febres*, 445 F.3d at 231.  Next, KHESLC indicates that it is subject to significant oversight by the Commonwealth.  Specifically, KHESLC must expend funds in furtherance of its public purpose, must provide an annual report to the Governor, must be audited annually, and must obtain approval before issuing certain types of bonds.  *See* Ky. Rev. Stat. §§ 164A.190, 164A.170, 164A.080.  Finally, KHESLC also must get approval from the legislature for capital projects and must submit all personal service contracts to the legislature.  *See* Ky. Rev. Stat. §§ 45A.695, 45A.705.  We are satisfied that Kentucky exercises sufficient control over KHESLC so that this factor weighs in favor of immunity.  *See In re Kahl*, 240 B.R. at 534 (finding that "while it appears that the Board enjoys a high degree of autonomy in the performance of its duties, its actions in general are circumscribed by the state education policies it must implement"); *see also U.S. ex rel. Oberg v. Pa. Higher Educ. Auth.*, No. 09-960, 2012 WL 6099086, at *6 (E.D. Va. Dec. 5, 2012) (finding KHESLC not an autonomous entity for purposes of Eleventh Amendment immunity).

(iv)    <u>Weighing all the Factors</u>

A review of the above factors indicates that KHESLC has not met its burden of production or persuasion in establishing that it is an arm of Kentucky.  The third factor is the only factor that actually weighs in KHESLC's favor.  Moreover, the first factor, which becomes more important in close cases such as this, weighs against KHESLC.  Given that KHESLC has the burden of production and persuasion, we cannot find that KHESLC is entitled to sovereign immunity at this time.

2.    *Kentucky Governmental Immunity*

KHESLC also argues that it is entitled to governmental immunity because it is an agency engaged in a government function.  An agency of the state government has "governmental immunity" from civil damages actions.  *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001). Governmental immunity is a public policy derived from the doctrine of sovereign immunity that is based on the reasoning "that courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions furnish an inadequate crucible for testing the merits of social, political or economic policy."  *Id.* at 519.  To determine if an entity is entitled to governmental immunity, the court examines:  (1) "the origin, or 'parent,' of the entity to determine if the entity is an agency (or alter ego) of a clearly immune parent[;]" and (2) "whether the entity performs a 'function integral to state government."  *Transit Auth. of River City v. Bibelhauser*, 432 S.W.3d 171, 173 (Ky. Ct. App. 2013) (citing *Comair, Inc. v. Lexington-Fayette Urban Cnty. Airport Corp.*, 295 S.W.3d 91, 99 (Ky. 2009)).  Governmental immunity shields state agencies from liability for damages for those acts that "constitute governmental functions, *i.e.*, public acts integral in some way to state government."  *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009).  Government functions are those "state level governmental concerns that are common to all of the citizens of this state . . . .  Such concerns include, but are not limited to, police, public education, corrections, tax collection, and public highways."  *Comair*, 295 S.W.3d at 99.  Immunity does not extend to agency acts that "serve merely proprietary ends, *i.e.*, non-integral undertakings of a sort private persons or businesses might engage in for profit."  *Id.*  In assessing whether the entity performs a government function, "the court is to consider the

20

balance of the entity's functions, not just the particular action at issue in the case." *Bibelhauser*, 432 S.W.3d at 173 (citations omitted).

KHESLC claims that it is engaged in a government function because it provides the infrastructure for financing education. Plaintiff claims KHESLC's loan servicing is not a government function but rather "private-sector, profit-making activity." (Pl.'s Opp'n 32.) KHESLC correctly recognizes that "education is an integral aspect of state government and that activities in direct furtherance of education will be deemed governmental rather than proprietary." *Breathitt*, 292 S.W.3d at 887. For instance, a school board performs a governmental function when it authorizes interscholastic athletics at its schools because such athletics substantially contribute to the educational purpose of the schools. *Yanero*, 65 S.W.3d at 527. Along those same lines, providing housing for a school's night watchperson on school premises is a government function because it furthers the schools educational mission by protecting the facilities where the mission is carried out. *Breathitt*, 292 S.W.3d at 887-88; *see also Autry v. W. Ky. Univ.*, 219 S.W.3d 713, 718 (Ky. 2007) (same when providing housing to students). Here, KHESLC is an agent of Kentucky, as its "parent" is Kentucky. KHESLC was created through the Kentucky legislature "and empowered to finance student loan operations in Kentucky by the issuance of its bonds and notes for the purpose of making and purchasing insured student loans." Ky. Rev. Stat. Ann. § 164A.040. The legislature's intent was to "provid[e] higher education assistance to needy, qualified students." Ky. Rev. Stat. Ann. § 164A.010. KHESLC's function as a whole is to provide loans and loan servicing to further the education of Kentucky citizens. Thus, KHESLC actions constitute governmental functions, even though the actual action at issue in this case does not involve the education of a Kentucky citizen. This is true even though KHESLC competes with private lenders or servicers. *Withers*

*v. Univ. of Ky.*, 939 S.W.2d 340 (Ky. 1997) (finding University of Kentucky Medical Center's teaching mission rendered its activities governmental even though it competes with private hospitals).  As a result, KHESLC qualifies for governmental immunity.

Plaintiff claims that KHESLC's governmental immunity applies only to tort claims, and does not apply here where the sole remaining count is one for restitution (Count VI).  Plaintiff's assertion is incorrect.  The state cannot be sued except upon a specific and explicit waiver of sovereign immunity.  *Withers*, 939 S.W.2d at 344-46.  Kentucky has waived its immunity for breach of contract claims based on "lawfully authorized written contracts . . . brought in the Franklin Circuit Court."  Ky. Rev. Stat. Ann. § 45A.245.  This waiver is not applicable to Plaintiff's claim for restitution because the claim is not based on any type of contract with KHESLC—written or otherwise.  *See Commonwealth v. Whitworth*, 74 S.W.3d 695, 699 (Ky. 2002) (affirming that suit based on oral contract with the state was barred by sovereign immunity).  Moreover, § 45A.245 "has not waived its sovereign immunity for contract actions brought in federal court" because breach of contract claims against the state must be brought in the Franklin Circuit Court.  *Lawrence v. Ky. Transp. Cabinet, (In re Shelbyville Rd. Shoppes, LLC)*, 486 B.R. 848, 851 (Bankr. W.D. Ky. 2013).  Therefore, Plaintiff's argument fails and KHESLC's governmental immunity applies.  Count VI will be dismissed as asserted against KHESLC.

## IV.    DISCUSSION OF ACCESS GROUP'S CLAIMS

### A.    Access Group's Breach of the Loan Contracts Claim

#### 1.    Statute of Limitations

Access Group brings a claim for breach of the Loan Contracts against Plaintiff, alleging that Plaintiff failed to repay her student loans as she promised in the Loan Contracts.  Plaintiff

claims that this claim is barred by the statute of limitations.  The statute of limitations is usually an affirmative defense.  However, it can also be proper grounds for dismissal of a complaint under Rule 12(b)(6) "[if] the allegations . . . show that relief is barred by the applicable statute of limitations."  *Jones v. Bock*, 549 U.S. 199, 215 (2007); *see also Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994) ("While the language of Fed. R. Civ. P. 8(c) indicates that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading.").  Plaintiff claims that the statute of limitations applicable to Access Group's claim is six years.  (Pl.'s Mot. 17.)  Access Group does not contest the applicable statute of limitations, but rather claims that the face of the Counterclaim does not indicate whether this claim was filed outside the six year limitations period.  (Access's Opp'n 11.)

  Initially we must address what state's limitations period applies here.  This claim is before us based on diversity jurisdiction.  We must therefore apply the choice-of-law principles of the forum state—Pennsylvania—in determining what statute of limitations applies.  *Mack Trucks, Inc. v. Bendinx-Westinghouse Auto. Air Brake Co.*, 372 F.2d 18, 20 (3d Cir. 1966) (citing *Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99 (1945)).  Pennsylvania courts apply the statute of limitations of the forum, unless Pennsylvania's borrowing statute applies.  *Id.*  Pennsylvania's borrowing statute mandates that "[t]he period of limitation applicable to a claim accruing outside [Pennsylvania] shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim."  42 Pa. Con. Stat. Ann. § 5521(b).  Plaintiff alleges that the applicable Ohio limitations period is six years.  No party asserts what the applicable limitations period is in Pennsylvania.  Our independent research

revealed that Pennsylvania has the same six-year statute of limitations that Plaintiff claims applies.  *See* 13 Pa. Con Stat. Ann. § 3118(a).  Since the statutes are the same, Pennsylvania's will apply.[11]

The statute provides that the action must be brought within six years "after the due date stated in the note or, . . . the accelerated due date."  13 Pa. Con. Stat. Ann. § 3118(a).  The only date stated in the Counterclaim is the date on which Plaintiff is alleged to have defaulted on the Loan Contracts, October 6, 2007.  (Countercl. ¶ 14.)  Access Group contends that the default date is not synonymous with the accelerated due date and therefore the face of the Counterclaim does not indicate that the statute of limitations bars this action.  We agree.  Plaintiff has not produced any legal authority to indicate what constitutes an "accelerated due date."  At this stage, we cannot assume that it is Plaintiff's default date, especially when Access Group asserts that it did not actually accelerate the loan until a later date.  Accordingly, the Counterclaim does not reveal when the limitations period started running, and the statute of limitations cannot justify Rule 12 dismissal.[12]

---

[11] The contracts at issue all have choice of law provisions dictating that Federal and Ohio law govern the contracts.  However, "[c]hoice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express."  *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 (3d Cir. 1992).  No express reference exists here.

[12] To clarify the issues that need to be resolved going forward, we find it necessary to address Access Group's incorrect assertion that the statute of limitations was tolled by Plaintiff's filing of the Complaint.  When Pennsylvania's statute of limitations applies, Pennsylvania's tolling provisions also apply.  *GE Med. Sys. v. Silverman*, No. 96-4596, 1998 WL 54361, at *2 (E.D. Pa. Feb. 2, 1998) (citing *Gee v. CBS, Inc.,* 471 F. Supp. 600, 641 (E.D. Pa. 1979)).  "The general rule in Pennsylvania is that counterclaims must be raised within the time provided by the statute of limitations."  *Davis v. Berks Cnty.*, No. 04-01795, 2007 WL 516128, at *10 (E.D. Pa. Feb. 8, 2007) (citations and quotations omitted); *Gumienik v. Lund*, 314 F. Supp. 749, 751 (W.D. Pa. 1970) ("We find the general rule in Pennsylvania to be that a cause of action which would be barred as an original action, because of the statute of limitations, may not be asserted as a counterclaim after the expiration of the statutory period.").  Therefore, in this case, if the

2. *Negotiable Instrument*

Plaintiff next claims that Access Group cannot bring a breach of contract claim because it is not a holder of the Loan Contracts and thus cannot enforce them.  The Loan Contracts are negotiable instruments.  As a result, according to Plaintiff, Access Group can enforce the Loan Contracts only if they were negotiated to Access Group, thereby making Access Group a holder. Access Group does not assert that it is a holder of the Loan Contracts.  Instead, it claims that National City Bank transferred the Loan Contracts to it through a number of assignments. Contrary to Plaintiff's assertion, this is enough to confer standing to Access Group to enforce the Loan Contracts.  Notes can be transferred by assignment and the transferee, whether or not a holder, has the right to enforce the instrument.  *Self Help Ventures Fund v. Jones*, No. 2012-A-14, 2013 WL 942513, at *4-5 (Ohio Ct. App. Mar. 11, 2013).[13]  Therefore, the Loan Contracts did not have to be negotiated to Access Group for Access Group to have standing.  Plaintiff's argument fails.

3. *Standing Challenges*

Finally, Plaintiff attacks Access Group's ability to bring the breach of contract claim based on standing.  Plaintiff specifically claims that Access Group has failed to allege any plausible facts that demonstrate an assignment of the Loan Contracts by National City Bank to Access Group.  A challenge to standing under Rule 12(b)(1) can take two forms:  a facial challenge or a factual challenge.  Plaintiff attempts to make both.

---

limitations period began running any time prior to January 21, 2008, Access Group's claim will be barred.

[13] The parties agree that Ohio law applies to the Loan Contracts pursuant to the choice-of-law provision contained in the Loan Contracts.  (Pl.'s Mot. 13 n.6; *see* Access's Opp'n 8-10.); *see also supra*, § III. A. n.3.

(i)      Facial Challenge

When a facial challenge is made, the court is restricted to a review of the allegations in the pleadings and any documents referenced therein.  *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 177 (3d Cir. 2000).  Moreover, the court accepts the allegations in the pleadings as true.  *Id.*  Plaintiff's facial challenge plainly fails.  In the Counterclaim, Access Group clearly states that "[b]etween 2000 and 2002, National City Bank assigned each of the Loans to Access Group pursuant to a Commitment and Loan Sale Agreement between National City Bank and Access Group, first entered into on April 1, 1998 . . . ."  (Countercl. ¶ 12.)  Accepting this factual assertion as true, the Loan Contracts were assigned to Access Group.  Thus, Plaintiff's standing challenge fails without considering the documents that Access Group attached to the Counterclaim.

(ii)      Factual Challenge

To successfully raise a factual challenge to subject matter jurisdiction, a party must challenge the facts alleged in the pleadings by presenting evidence.  *Gould*, 220 F.3d at 177. Here, Plaintiff has not done so.  Plaintiff's Motion simply states that the documents Access Group attached to its Counterclaim do not undisputedly establish that the Loan Contracts were assigned to Access Group.  Missing from the Motion is any citation to evidence that directly challenges Access Group's assertions that the Loan Contracts were assigned.  Plaintiff's attempt to point to previous litigation in which Access Group did not prove the assignments is not a direct factual challenge.  Instead, it requires us to make inferences that would be inappropriate, especially at this early stage in the litigation.  Because Plaintiff has not presented evidence contesting the allegations in the Counterclaim, the presumption of truthfulness remains with

Access Group.  *See Moyer Packing Co. v. United States*, 567 F. Supp. 2d 737, 748 (E.D. Pa.

2008).  As explained above, Plaintiff's jurisdictional challenge fails.

      **B.**      **Access Group's Unjust Enrichment Claim**

            *1.*      *Statute of Limitations*

Access Group brings a claim in the alternative for unjust enrichment based on the July

16, 1999 Loan Contract that Plaintiff claims she did not execute.  Plaintiff moves to dismiss this

claim arguing that the statute of limitations has run.  This argument fails.  As discussed above,

the statute of limitations is proper grounds for dismissal only when it is apparent from the face of

the complaint that the claim is barred.  *Oshiver*, 38 F.3d at 1384.  We agree with Access Group

that the statute of limitations on its unjust enrichment claim began to run once Plaintiff

renounced the July 16, 1999 Loan Contract.  The Counterclaim does not provide us with the date

on which that occured.  Therefore, it is not clear from the face of the Counterclaim that this claim

is barred.  We will not dismiss this claim.

            *2.*      *Standing*

Plaintiff next moves to dismiss this claim by bringing a facial challenge to Access

Group's standing.  Specifically, Plaintiff claims that Access Group has not alleged that it

conferred a benefit to Plaintiff.  Again, this argument fails.  We must accept the allegations in the

Counterclaim as true.  *Gould*, 220 F.3d at 177.  Access Group plainly alleges that it conferred a

benefit on Plaintiff by financing her education:  Plaintiff was loaned money pursuant to the July

16, 1999 Loan Contract with National City Bank, and National City Bank sold and assigned its

interest in that loan to Access Group.  (Countercl. ¶¶ 7, 12, 13, 24.)  This claim will not be

dismissed.

**V.      CONCLUSION**

For the foregoing reasons, Access Group and PNC's Motions to Dismiss will be granted,

KHESLC's Motion to Dismiss will be granted, and Plaintiff's Motion to Dismiss will be denied.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**
