IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TAMARA BERG                                :
                                           :          CIVIL ACTION
                    v.                     :
                                           :          NO. 13-5980
ACCESS GROUP, INC., ET AL.                 :


**SURRICK, J.**                                         **JANUARY 16, 2015**

**MEMORANDUM**

Presently before the Court is Plaintiffs' Motion for Leave to Amend Complaint (ECF No.

47).  For the following reasons, Plaintiffs' Motion will be granted in part and denied in part.

I.      **BACKGROUND**

        A.      **Factual History**

        This case arises out of a series of student-loan contracts entered into by Plaintiff Tamara

Berg and proposed Plaintiff Angela Corral to finance their respective law-school educations.

(Proposed Am. Compl. ¶¶ 1, 17, 57, ECF No. 47-1.)  Berg and Corral applied for this financial

aid through lending programs sponsored by Defendant Access Group, Inc.  (*Id.* ¶¶ 17, 57.)  The

loans were provided by National City Bank, which has since been acquired by Defendants PNC

Financial Services, Inc.; PNC Bank; and PNC Bank N.A. (collectively, "PNC").  (*Id.* ¶¶ 1, 15.)

        Berg entered into four loan contracts with National City:

- Berg Loan One, July 16, 1999:  $24,000.[1]

- Berg Loan Two, April 2, 2000:  $800

- Berg Loan Three, August 23, 2000:  $28,026

- Berg Loan Four, July 23, 2001:  $30,216

---

[1] Berg disputes that she signed this loan contract.  (Proposed Am. Compl. ¶ 19 n.2.)

(*Id.* ¶¶ 19-22 & n.2.)  Corral entered into six loan contracts with National City:

- Corral Loan One, August 24, 2001:  $9,573

- Corral Loan Two, June 10, 2002:  $8,000

- Corral Loan Three, June 10, 2002:  $16,385

- Corral Loan Four, May 1, 2003:  $6,800

- Corral Loan Five, May 1, 2003:  $14,325[2]

- Corral Loan Six, August 24, 2003:  $11,000

(*Id.* ¶¶ 59-67.)

All of Berg's loan contracts and at least one of Corral's loan contracts require the

borrower to pay a guarantee fee of 6% and supplemental guarantee fee of up to 6.9% as a

condition of receiving the loan.  The language in the loan contracts regarding guarantee fees

differs in style, though not in substance.  Two of Berg's loan contracts and one of Corral's loan

contracts state:

> I will pay a guarantee fee not to exceed 12.9% of the outstanding principal balance, including accrued interest that has been added to the principal balance . . . . The guarantee fee will be sent to a party who will guarantee my loan.  I agree that you can add the amount of the guarantee fee to the outstanding balance of my loan.  I will not be entitled to any refund of the guarantee fee.
>
> I acknowledge that the guarantee fee is a fair and reasonable charge for the guarantee of my loan, and represents your actual expenses incurred in obtaining such guarantee, and that you would not make the loan without such guarantee.

(Berg Loan Three § G, Berg Loan Four § G, Corral Loan One § G, Proposed Am. Compl. Exs.

3-4, 6.)  Similarly, two of Berg's loan contracts state:

> I will pay a guarantee fee to [National City Bank], which [National City Bank] will forward to The Education Resources Institute, Inc. (hereinafter referred to as

---

[2] Corral alleges that although the contract states that the amount was $15,825, she only received $14,325.  (Proposed Am. Compl. ¶ 66.)

"TERI"), to pay for its guarantee of this Promissory Note.  I will pay a guarantee fee equal to 6% of the amount of each disbursement. . . .

I will pay a supplemental guarantee fee determined by [National City Bank], not to exceed 6.9% of the principal amount advanced to me or paid on my behalf. . . . The supplemental guarantee fee will be sent to TERI. . . .

I acknowledge that the guarantee fee and the supplemental guarantee fee are fair and reasonable charges for the guarantee of my loan, and represent [National City Bank's] actual expenses incurred in obtaining such guarantee, and that [National City Bank] would not make the loan without such guarantee.

(Berg Loan One § G, Berg Loan Two § G, Proposed Am. Compl. Exs. 1-2.)  Corral does not have in her possession the terms and conditions that correspond with her other five loan contracts.  (Proposed Am. Compl. ¶ 67 & n.3.)

Between February 21, 2003, and about April 4, 2007, Berg paid a total of $25,064.72 to Access group through its loan servicer, the Kentucky Higher Education Student Loan Corporation ("KHESLC").  (*Id.* ¶ 32.)  She has been charged guarantee fees and supplemental guarantee fees of at least $10,533.70.  (*Id.* ¶ 33.)  Berg requested a temporary loan forbearance in April 2007 pursuant to Section I of the loan contracts, which states:

If I am unable to repay my loan in accordance with the terms established under Paragraph E of this Promissory Note, I may request that you modify these terms. I understand that such modification would be at your option.  I understand that I will remain responsible for payment of interest during any period of forbearance.

(*Id.* ¶ 35; Berg Loan One § I, Berg Loan Two § I; *see also* Berg Loan Three § I, Berg Loan Four § I (using similar language to address forbearance requests).)  After initially being denied forbearance, Berg was granted a temporary forbearance through December 2007 by KHESLC. (*Id.* ¶¶ 36-40.)  In November 2007, Berg sent two letters to Access Group seeking to discuss alternative payment arrangements.  (*Id.* ¶¶ 43-44.)  She was informed that her loans had been placed in default, and that she could not resume periodic payments in December 2007 because the balance on the loans was now due in full.  (*Id.* ¶¶ 45-46.)

Access Group filed suit against Berg in California state court on September 11, 2012, seeking repayment of the student loans. (*Id.* ¶ 50.) However, Access Group could not demonstrate that it was the real party in interest to the loan contracts, and it voluntarily dismissed its case. (*Id.* ¶¶ 51-53.) During discovery in the California litigation, Access Group attested that the guarantee fees and supplemental guarantee fees that Berg had paid were never sent to a third party to guarantee her loans. (*Id.* ¶ 54.)

Corral has paid $92,968.34 on her student loans through the date that the Proposed Amended Complaint was filed. (*Id.* ¶ 71.) She is current on her loan repayments and has a remaining balance of $22,559.99. (*Id.* ¶ 73.) Corral has been charged guarantee fees of at least $6,591.87. (*Id.* ¶ 72.)

### B.      Procedural History

Berg filed a Complaint against Defendants in this Court on October 11, 2013. (Compl., ECF No. 1.) The Complaint alleged counts as an individual and as a putative class representative for breach of contract, misrepresentation, and restitution, as well as one count for restitution in her individual capacity. (Compl. ¶¶ 36-78.) Defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). Berg filed a motion to dismiss Access Group's counterclaims. By Memorandum and Order dated September 26, 2014, Defendants' motions were granted. (ECF Nos. 43-44.) Berg's motion to dismiss Access Group's counterclaims was denied. (*Id.*)

Berg then filed a motion for reconsideration of our Order denying her motion to dismiss the counterclaims (ECF No. 45). That motion was denied. (ECF No. 55.) Berg also moved for leave to amend her Complaint in an attempt to remedy the deficiencies highlighted in our Memorandum granting Defendants' motions to dismiss. (ECF No. 47.) To address our finding that Berg's failure to remain current on her student loans precluded her from bringing a breach of

contract claim, the Proposed Amended Complaint seeks to add Corral, who has remained current

on her student loans, as a plaintiff in this action.  (Pls.' Br. 2.)

Defendants oppose Plaintiffs' motion to amend, arguing that amendment would be futile

because the Proposed Amended Complaint cannot survive a Rule 12(b)(6) motion.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 15(a)(2),[3] "a party may amend its pleading only

with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Courts

"should freely give leave when justice so requires."  *Id.*  "[I]f a complaint is vulnerable to

12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment

would be inequitable or futile."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008)

(citation omitted).  An "[a]mendment would be futile if the amended complaint would not

survive a motion to dismiss for failure to state a claim."  *Budhun v. Reading Hosp. & Med. Ctr.*,

765 F.3d 245, 259 (3d Cir. 2014) (citation omitted).  We analyze the non-fraud-based counts in

Plaintiffs' Proposed Amended Complaint under the familiar standard of *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  *Budhun*, 765 F.3d at 259.  For counts sounding in fraud, we

determine whether they satisfy the heightened pleading standards of Federal Rule of Civil

Procedure 9(b).  *See Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2008) (nonprecedential)

(affirming denial of leave to amend complaint on basis of futility where proposed amendment to

RICO claim failed to meet Rule 9(b)'s heightened pleading requirement).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain

sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"

---

[3] Plaintiffs cannot amend the Complaint as of right under Rule 15(a)(1), as the 21-day period following Defendants' filing of their 12(b)(6) motion has expired.  *See* Fed. R. Civ. P. 15(a)(1)(B).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).  "A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits."  *McTernan v. City of York*, 564 F.3d 636, 646 (3d Cir. 2009) (citation omitted).

In determining whether dismissal is appropriate, courts use a two-part analysis.  *Fowler*, 578 F.3d at 210.  First, courts separate the factual and legal elements of the claim and accept all of the complaint's well-pleaded facts as true.  *Id.* at 210-11.  Next, courts determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  *Id.* at 211.  Given the nature of the two-part analysis, "'[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *See McTernan v. City of York*, 577 F.3d 521, 530 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. 663-64).

In addition to the Rule 8(a)(2) general pleading standard, the Federal Rules of Civil Procedure require a heightened pleading standard for certain actions.  Fed. R. Civ. P. 9(b).  When a litigant alleges fraud, he or she must do so "with particularity."  *Id.*  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *Id.*  Pursuant to this heightened pleading standard, plaintiffs

must "plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).  This requires a description of the "who, what, when, where and how of the events at issue."  *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotation marks and citation omitted).  Rule 9(b) is generally considered satisfied when a defendant has "fair notice" of the charges against it.  *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1126 (E.D. Pa. 1991).

## III.    DISCUSSION

To address the deficiencies that we identified in our Memorandum dismissing the Complaint (ECF No. 43), Plaintiffs have added additional allegations regarding their breach of contract and intentional misrepresentation claims.[4]  (Pls.' Br. 2-3, ECF No. 47.)

### A.    Breach of Contract (Counts I and II)

In the Memorandum addressing Defendants' motions to dismiss, we concluded that Berg had not sufficiently alleged a breach of contract claim because she did not allege that she had performed under the loan contracts, which is an essential element of a breach of contract claim. (*See* Mem. 7-10.)  Since Berg's failure to stay current on her loan payments defeated her breach of contract claim, it was not necessary to determine whether the language of the contracts would support her claim.  (*Id.* at 10 n.4.)

To remedy this deficiency, the Proposed Amended Complaint seeks to add Corral, who has remained current on her loan payments, as a plaintiff.  It also contains additional allegations about Berg's attempts to obtain a temporary forbearance on her loan payments pursuant to the

---

[4] Plaintiffs have dropped their restitution claims and the counts related to assignment of the loans.

loan contracts, and her attempts to resume making periodic payments.  (Proposed Am. Compl. ¶¶ 36-46.)  The Proposed Amended Complaint alleges that "guarantee fees 'not to exceed' 12.9% may be charged only for 'actual expenses incurred in obtaining such guarantee,'" and that by charging the full 12.9 percent of the balance without incurring any cost to obtain a guarantee, Defendants had breached the loan contracts.  (*Id.* ¶¶ 5-6, 88-89.)  Plaintiffs' theory is that the loan contracts only permitted Defendants to charge Plaintiffs the lower of 12.9 percent of their loan balance or the actual cost incurred to obtain a third-party guarantee.

Defendants counter that Berg still cannot allege that she performed under the loan contracts, and that the terms of the guarantee fees are binding admissions by Plaintiffs regarding the guarantee fees rather than promises by Defendants.  (Defs'. Opp. 4-9, ECF No. 51; *see also id.* at 9 (arguing that the guarantee fee provision "does not purport to impose any obligation on Access Group.  To the contrary, the statement is an unambiguous admission *by Proposed Plaintiffs* that the guarantee fees *do* 'represent [the lender's] actual expenses'").)  We conclude that Berg cannot allege that she performed on the loan contracts because she cannot allege that she made the required interest payments during the period of forbearance.  We further conclude that, because the language of the loan contracts establishes that Plaintiffs did not have a right to be charged a guarantee fee equal to the lesser of 12.9 percent of the outstanding balance or the actual cost of the third-party guarantee, as the Proposed Amended Complaint alleges, Plaintiffs cannot state a claim for breach of contract.

As an initial matter, Berg is incorrect when she argues that the forbearance she allegedly received on her loans excused her performance.  (Pls.' Br. 4.)  Though the putative forbearance relieved her of the duty to pay down the principal amount of the loan, the loan contracts are clear that she still had a duty to make interest payments on her loans.  For example, Berg Loans One

8

and Two state that "I understand that I will remain responsible for payment of interest during any period of forbearance."  (Berg Loan One § I; Berg Loan Two § I.)  There is no allegation that Berg made these payments.  She is therefore in default on her loans and cannot now insist on performance by Defendants.

Nor do the allegations in the Proposed Amended Complaint state a claim on behalf of Corral and the class plaintiffs for breach of contract.  Plaintiffs argue that the exact amount of the guarantee fee was contingent on the actual cost of guaranteeing the loan.  (Pls.' Reply 3-4.)  The Proposed Amended Complaint alleges that the loan contracts "stat[e] that guarantee fees 'not to exceed' 12.9% may be charged only for 'actual expenses incurred in obtaining such guarantee' . . . ."  (Proposed Am. Compl. ¶ 5 (quoting Berg Loan One § G).)  This is not what the contracts say.  Plaintiffs have created this alleged right to pay only the actual cost of the guarantee by combining the statement in the loan contracts that Plaintiffs would pay a guarantee fee "not to exceed" 12.9 percent of the outstanding principal balance, with the clause in which "[Plaintiffs] acknowledge that the guarantee fee . . . represents [Defendants'] actual expenses incurred in obtaining such guarantee."  (Proposed Am. Compl. ¶¶ 5-6 (quoting Berg Loan One § G); Pls.' Reply 2-3.)  "Generally, where there is a conflict between a written document attached to the complaint and an allegation in the pleading based on that writing, the terms of the written document control."  *Power Mktg. Direct, Inc. v. Ball*, No. 03-1004, 2004 WL 5826149, at \*4 (S.D. Ohio Apr. 6, 2004) (citation omitted).  We must therefore look to the language of the loan contracts to determine if the Proposed Amended Complaint states a claim for relief.

The threshold question in our analysis is whether the language of the loan contracts is clear and unambiguous.  If so, "[t]he clear and unambiguous language of a contract that is made part of the pleadings overcomes contradictory conclusory averments of the Complaint."  *ON*

*Marine Servs. Co., Inc. v. EVTAC Mining, LLC.*, No. 01-0934, 2002 WL 31412437, at *3 (S.D.

Ohio Sept. 30, 2002).[5] "When the language of a written contract is clear, a court may look no

further than the writing itself to find the intent of the parties." *Westfield Ins. Co. v. Galatis*, 797

N.E.2d 1256, 1261 (Ohio 2003).

      Plaintiffs' argument is based on the loan contracts' requirement that borrowers

"acknowledge that the guarantee fee is a fair and reasonable charge for the guarantee of [the]

loan, and represents [Defendants'] actual expenses incurred in obtaining such guarantee . . . ."

(Berg Loan Three § G.)  Plaintiffs cite no authority for the proposition that a contract term

containing an acknowledgment by one party can bind the other party, and we are aware of none.

Our research revealed only one case that addressed the issue.  That case concluded that an

acknowledgement by one party to a contract did not bind other parties to the contract.  *See ON

Marine Servs. Co.*, 2002 WL 31412437, at *3-4 (granting motion to dismiss where contract's

acknowledgement "d[id] not expressly mention or even imply that the liabilities imposed by its

terms apply to the remaining Defendants"; acknowledgement only bound party making the

acknowledgement).

      The loan contracts here are clear and unambiguous:  they permit Defendants to charge

guarantee fees "not to exceed 12.9% of the outstanding principal balance, including accrued

interest that has been added to the principal balance . . . ."  (Berg Loan Three § G.)  Furthermore,

the loan contracts unambiguously require Plaintiffs to "acknowledge that the guarantee fee is a

fair and reasonable charge for the guarantee of [the] loan, and represents [Defendants'] actual

expenses incurred in obtaining such guarantee, and that [Defendants] would not make the loan

without such guarantee."  (*Id.*)  Berg Loans Three and Four and Corral Loan One also require

---

[5] As we noted in our September 26, 2014 Memorandum, Ohio law governs the breach of
contract claims.  (*See* Mem. 7 n.3, ECF No. 43.)

borrowers to acknowledge that "[they] will not be entitled to any refund of the guarantee fee"—

the precise relief Plaintiffs request here.   Plaintiffs cannot allege a breach of contract by cutting

out portions of the loan contracts and pasting them back together to say something completely

different from the plain language of the contracts.  *See Nickoson v. Provident Life & Accident*

*Ins. Co.*, 202 F.3d 269, 2000 WL 32052, at \*5 (6th Cir. 2000) (nonprecedential table case) ("To

accept [the defendant's] interpretation of the policy language would be to permit [it] to introduce

ambiguity where it does not appear on the face of the policy."); *Freeman-McCown v. Cuyahoga*

*Metro. Hous. Auth.*, Nos. 77182, 77380, 2000 WL 1594090, at \*5 (Ohio Ct. App. Oct. 26, 2000)

(nonprecedential) ("The trial court properly rejected [the plaintiff's] effort to introduce

ambiguity into the contract terms.").  We reject Plaintiff's argument that the loan contracts

permitted Defendants to charge Plaintiffs only for the actual cost of the third-party guarantees,

rather than the 12.9 percent stated in the contracts.  The Proposed Amended Complaint therefore

fails to state a claim for breach of contract.

## B.  Intentional Misrepresentation (Count III)

Plaintiffs renew their intentional misrepresentation claim, which was dismissed in the

September 26 Memorandum and Order.  (Mem. 10-14.)  Defendants argue that this claim is

barred by the gist of the action doctrine, and that Plaintiffs have still failed adequately to allege

materiality.  (Defs.' Opp. 10-14.)

### i.      *Gist of the Action Doctrine*

The gist of the action doctrine "operates to preclude a plaintiff from re-casting ordinary

breach of contract claims into tort claims."  *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 581

(Pa. Super. Ct. 2003).  As the Pennsylvania Superior Court has explained, "[t]ort actions lie for

breaches of duties imposed by law as a matter of social policy, while contract actions lie only for

breaches of duties imposed by mutual consensus agreements between particular individuals."

*eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (quoting *Bash v.*

*Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. Ct. 1992)).  Therefore, "[t]o permit a promisee to

sue his promisor in tort for breaches of contract inter se would erode the usual rules of

contractual recovery and inject confusion into our well-settled forms of actions."  *Pittsburgh*

*Const. Co.*, 834 A.2d at 582.  Even though the gist of the action doctrine has never explicitly

been recognized by the Pennsylvania Supreme Court, *id.*, the Pennsylvania Superior Court and

federal courts in this District have routinely applied it to bar tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties
> allegedly breached were created and grounded in the contract itself; (3) where the
> liability stems from a contract; or (4) where the tort claim essentially duplicates a
> breach of contract claim or the success of which is wholly dependent on the terms
> of a contract.

*Id.*  The Superior Court explained in *eToll*—which "has served as the Urtext in both federal and

state court for essentially all cases applying the gist of the action doctrine under Pennsylvania

law," *Vives v. Rodriguez*, 849 F. Supp. 2d 507, 520 (E.D. Pa. 2012)—that application of the

doctrine "turn[s] on the question of whether the fraud concerned the performance of contractual

duties."  *eToll*, 811 A.2d at 19; *see also Plexicoat Am., LLC v. PPG Architectural Finishes, Inc.*,

9 F. Supp. 3d 484, 487 (E.D. Pa. 2014) ("Where the allegedly fraudulent, pre-contractual

statements concern specific duties later outlined in the contract, the gist of the action doctrine

may apply."); *Vives*, 849 F. Supp. 2d at 521 ("[M]isrepresentations as to duties later enshrined in

a contract are barred by the doctrine."); *Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 387 (3d

Cir. 2004) (per curiam) ("[T]he gist of the action doctrine bars tort claims against an individual

defendant where the contract . . . created the duties that the individual allegedly breached.").

The loan contracts do not contain any duty requiring Defendants to forward the guarantee fee to a third-party guarantor.  Indeed, this is the basis for Defendants' argument as to why Plaintiffs' breach of contract claim is defective.  (*See, e.g.*, Defs.' Opp. 9 ("The provision of the agreement on which Proposed Plaintiffs fixate—concerning "actual expenses" in ¶ G.2—does not purport to impose any obligation on Access Group."); *id.* at 8 ("These provisions contain no promise by the lender to limit the guarantee fee to its "actual costs.").)  As we have concluded that the loan contracts do not impose a duty on Defendants to forward the guarantee fee to a third-party guarantor, the gist of this action lies in fraud—not contract.  *See Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 719 (Pa. Super. Ct. 2005) ("[I]f the fraud did not concern the performance of contractual duties, then the gist of the action would be the fraud, rather than any contractual relationship between the parties.").

ii.     *Whether Plaintiffs' Intentional Misrepresentation Allegations Satisfy Rule 9(b)*

To state a claim for intentional misrepresentation, which in Pennsylvania is generally referred to as fraudulent misrepresentation, Plaintiffs must allege:  "(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result."  *Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Invs.*, 951 F.2d 1399, 1409 (3d Cir. 1991).  Because this claim is grounded in fraud, Plaintiffs' allegations must satisfy the heightened pleading standard of Rule 9(b).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

Previously, Plaintiffs' intentional misrepresentation claim was dismissed for failure to allege materiality.  We noted that "nothing in the Complaint indicates that the misrepresentation

affected [Berg's] conduct at all." (Mem. 12.)  Plaintiffs attempt to cure this deficiency by

alleging that "Defendants' misrepresentations at the time of the loan agreement were material.

Had Plaintiffs known that the guarantee fees did not, in fact, represent the actual expenses

incurred for a third-party guarantee of their loans, they would have sought educational financing

elsewhere." (Proposed Am. Compl. ¶ 110, *see also id.* ¶ 112.)  Defendants argue that the

Proposed Amended Complaint still fails adequately to allege materiality. (Defs.' Opp. 10-13.)

Defendants contend that the Proposed Amended Complaint simply repeats the definition

of materiality, without alleging facts to support this claim.  We are not persuaded.  Plaintiffs

allege that "they would have found educational financing elsewhere" if they had known that

rather than using the guarantee fee to secure a third-party guarantee, Defendants were simply

going to pocket the money.  (Proposed Am. Compl. ¶ 110)  This is a fact, verified by Plaintiffs

and subject to the penalties of Rule 11 if untrue.  It is unclear what other facts Plaintiffs could

allege to demonstrate materiality, as the issue concerns what would have happened if

circumstances had been different—which, of course, they were not.[6]

It is reasonable to conclude that Plaintiffs would have objected to paying thousands—

perhaps tens of thousands—of dollars for a guarantee fee if they had known that the fee would

simply go to Defendants' bottom line, rather than the purpose for which Defendants stated it

would be used.  They allege in a verified complaint that this is the case.  This is sufficient to

establish the materiality element of a fraudulent misrepresentation claim.

---

[6] Though we are unable to find any law on the matter, in this sense materiality is akin to a
party's state of mind, as suggested by the requirement in certain contexts that materiality be
assessed by a reasonable person standard. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 22 n.5
(1999) ("[A] matter is material if . . . a reasonable man would attach importance to its existence
or nonexistence in determining his choice of action in the transaction in question.").  As Lord
Bowen observed in an early English misrepresentation case, "the state of a man's mind is as
much a fact as the state of his digestion." *Edgington v. Fitzmaurice*, [1882] 29 Ch. 459, 483
(Eng.).

The Proposed Amended Complaint also alleges sufficient facts to establish the other elements of fraudulent misrepresentation.  The loan contracts represent that "[t]he guarantee fee will be sent to a party who will guarantee [Plaintiffs'] loan[s]" (Berg Loan Three § G, Berg Loan Four § G, Corral Loan One § G), and that "[National City Bank] will forward [the guarantee fee] to The Education Resources Institute, Inc." (Berg Loan One § G, Berg Loan Two § G.)  The Proposed Amended Complaint alleges that Defendants did not procure a third-party guarantee, but instead used the guarantee fees as "a pricing mechanism that promotes the economic viability of the Access Group, Inc. private education loan program in question." (Proposed Am. Compl. ¶ 7.)  This establishes that there was a misrepresentation, and that at the time the loans were made, Defendant had no intention of forwarding guarantee fees to a third-party guarantor.  This was a fraudulent misrepresentation that was false at the time it was made—not a contractual promise that Defendant failed to keep.  *See Mellon Bank Corp.*, 951 F.2d at 1410 ("[A] statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of fact." (quoting *Brentwater Homes, Inc. v. Weibley*, 369 A.2d 1172, 1175 (Pa. 1977)) (internal quotation marks omitted)); *see also* Restatement (Second) of Torts § 530(1) (1977) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.").

Moreover, the Proposed Amended Complaint alleges that Plaintiffs "relied on these misrepresentations when entering into the loan contracts as well as when making loan payments that they believed to be consistent with the terms of their contracts." (Proposed Am. Compl. ¶ 108.)  This reliance was justifiable:  Plaintiffs had no reason to know that the thousands they were paying in guarantee fees were in reality a "pricing mechanism" to enhance Access Group's profits.  Finally, we conclude that Plaintiffs were damaged by the misrepresentation.  While

15

Plaintiffs allege that they paid excess guarantee fees as a result (*id.* ¶ 114), at a minimum Plaintiffs were deprived of the opportunity to shop for an appropriate student loan while armed with all the information they needed to make an informed decision.

In sum, we conclude that the Proposed Amended Complaint satisfies the elements of a fraudulent misrepresentation claim. Since the fraudulent misrepresentation count would withstand scrutiny under Rule 12(b)(6) and Rule 9(b), we will permit Plaintiffs to amend the Complaint as to that count only.

## IV.     CONCLUSION

Although Plaintiffs' breach of contract claim would not survive a motion to dismiss under Rule 12(b)(6), the Proposed Amended Complaint adequately alleges a fraudulent misrepresentation claim. Plaintiffs will therefore be permitted to amend the Complaint to bring a claim for fraudulent misrepresentation. For the foregoing reasons, Plaintiffs' Motion for Leave to Amend Complaint is granted in part and denied in part.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J**

16